FOURTH DIVISION

May 24, 2001

No. 1-00-2314

DENISE GUILLEN, a Minor, by Suamy )

Guillen, Her Father and Next Friend, )

) Appeal from the 

Plaintiff-Appellant and 
 ) Circuit Court of

Cross-Appellee, ) Cook County.

)

v. 
)

) 

POTOMAC INSURANCE COMPANY OF ) 

ILLINOIS, ) Honorable

) Ellis E. Reid,

Defendant-Appellee
 and ) Judge Presiding.

Cross-Appellant.

JUSTICE SOUTH delivered the opinion of the court:

This lawsuit arises from an insurance policy issued by Potomac Insurance Company of Illinois (Potomac), to Ezequiel and Maria Ortiz (insureds/defendants).  The initial policy was issued for the period of October 12, 1991 to October 12, 1992, which contained no lead exclusion provision.  Two additional policies were issued during the periods of October 12, 1992 to October 12, 1993, and October 12, 1993 to October 12, 1994.  The October 12, 1993, policy contained a lead exclusion provision which provides in pertinent part:

"This insurance does not apply to:

'Bodily injury'
, 
'property damage'
, 
'personal injury'
, or 
'advertising injury' 
arising out of, resulting from, or in any way caused or contributed to by the actual, alleged or threatened ingestion, inhalation, absorption of, exposure to or presence of lead in any form emanating from any source, or

Any loss, cost or expense arising out of, resulting from or in any way related to any:

claim, suit, request, demand, directive or order by any person *** that any 
'insured'
 or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of lead in any form, or to any

claim or suit on behalf of any person, *** for damages because of testing for, monitoring, cleaning up, removing, containing, treating, or detoxifying or neutralizing, or in any way responding to, or assessing the effects of lead in any form.

We shall not be obligated to investigate, defend or indemnify any 
'insured'
 or any person or entity claiming any right under the policy, for the matters excluded in this endorsement."

This exclusion included all subsequent Potomac policies.

In May 1996, plaintiff, Denise Guillen, a minor, by Suamy Guillen, her father and next friend, filed a negligence complaint against the insureds.  The insureds owned property located at 2700-02 North Sacramento in Chicago, Illinois.  Plaintiff lived at the property between October 1993 to September 1995.  The complaint alleged that while a tenant in one of the insureds' buildings, the minor plaintiff was poisoned due to exposure to lead.  Plaintiff asserted that she sustained substantial and permanent injury due to this lead poisoning, which has affected her educational, social, behavioral, vocational, and intellectual development.  This complaint was based upon negligence, as well as violations of the Chicago Municipal Code (§ 5-12-110 (amended November 6, 1991), §13-196-540(d) (1990), §§7-4-030, 7-4-110 (1994)) and the Lead Poisoning Prevention Act (410 ILCS 45/1, 
et seq.
 (West 1996)).

Insureds tendered plaintiff's claims to Potomac.  However, Potomac denied coverage and refused to defend insureds due to the lead hazard exclusion added to the October 12, 1993, policy.  Potomac did not file a declaratory judgment action.

In July 1997, the insureds entered into a settlement agreement with plaintiff. Insureds agreed to pay plaintiff "$600,000, to be satisfied solely through the assignment to Plaintiff *** of *** all of their rights to payment, if any, from General Accident Insurance. *** By this paragraph, Defendants are not assigning to Plaintiff any of their rights to insurance protection or coverage otherwise provided to Defendants under the Policy, but only their rights to payments, if any, under the Policy arising out of the claims asserted against Defendant in the Action or settlement thereof, and only to the extent permitted by law or otherwise."  The settlement agreement also contained a mutual release provision which stated:

"5.  
Mutual Releases
.
  Plaintiff hereby releases Defendants *** from all claims, whether in law or in equity, that Plaintiff now or could in the future have against them arising out of any matter occurring prior to the date of this agreement and which were asserted in the Action or are in any way related to the allegations made in the Action.  This release, however, does not include claims arising out of a failure of a party to perform in conformity with the terms of this agreement.

Defendants *** hereby release Plaintiff from all claims, whether in law or in equity, that they now or could in the future have against Plaintiff arising out of any matter occurring prior to the date of this agreement and which were asserted in the Action or are in any way related to the allegations made in the Action.  This release, however, does not include claims arising out of a failure of a party to perform in conformity with the terms of this agreement."

In March 1998, plaintiff filed an amended complaint for declaratory judgment against Potomac.  Plaintiff alleged that proper notice of the addition of the lead exclusion was not given to the insureds and, therefore, did not become a part of the policy or preclude coverage of the underlying case.  Plaintiff further alleged that since Potomac wrongfully refused to defend the insureds, it was estopped from asserting any defenses under the policy.  Plaintiff further argues that Potomac has a duty to indemnify the insureds and to honor the settlement agreement entered into with the minor plaintiff. 

In May 1998, Potomac filed an answer to plaintiff's amended complaint raising 14 affirmative defenses.

The parties filed cross-motions for summary judgment.  In Potomac's motion for summary judgment, it asserted that on July 28, 1993, 75 days prior to renewal, it had provided written notice of the addition of the lead exclusion to the insureds.  As such, it maintained that there was no duty to defend the insureds since the lead exclusion barred coverage for plaintiffs' lawsuit.  Furthermore, Potomac argues that it has no duty to indemnify the insureds because it is not "legally obligated to pay damages to the plaintiff, because no judgment exists against the defendants and they have not paid any money pursuant the settlement agreement."

On June 23, 2000, the circuit court found that Potomac had breached its duty to defend the insureds and was estopped from raising any policy defenses.  However, it granted summary judgment in favor of the Potomac on the issue of Potomac's duty to indemnify.  Both parties have filed timely cross-appeals.

Plaintiff raises one issue on appeal:  whether the trial court erred by permitting Potomac to raise its claimed defenses that there was a failure of a condition precedent under the policy or that its insureds were not "legally obligated to pay" the $600,000 they agreed to pay minor plaintiff even though the trial court concluded that Potomac breached its duty to defend and was estopped from raising any defenses.

Potomac raises three issues on appeal: (1) whether plaintiff, as assignee, has proven all elements of a 
prima facie
 claim for indemnification under Potomac's policies where the assignors had no rights under the policies to assign to plaintiff; (2) whether the trial court erred in determining that Potomac had not maintained proof of mailing of the notification of the adoption of the lead exclusion endorsement to the policy; and (3) whether the trial court erred in concluding that Potomac breached a defense obligation under its policies and was therefore estopped.

The insureds have also submitted a joint reply and cross-appellee's brief to the court.  In their brief, insureds support plaintiff's argument on appeal and additionally maintain that because the insureds' "legal obligation to pay" the minor plaintiff is a condition precedent to coverage under the policy, the estoppel doctrine bars insurer from raising it as a defense.

The issues raised by the parties on appeal are essentially subissues to two primary issues.  First, we must determine whether the insurer, Potomac, had a duty to defend its insureds and, if so, whether that duty was breached.  Second, we must determine whether Potomac had a duty to indemnify its insureds.

In Illinois, an insurer's duty to defend is separate and distinct from its duty to indemnify, with the duty to defend being broader than the duty to indemnify.  
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 125, 607 N.E.2d 1204, 1220 (1992).  In determining whether there is a duty to defend, a court looks to the allegations in the underlying complaint and compares those allegations to the relevant provisions in the insurance policy.  
Outboard Marine
, 154 Ill. 2d at 107-08, 607 N.E.2d at 1212.  If the facts alleged in the underlying complaint fall within or potentially fall within the coverage of the policy, the insurer's duty to defend is triggered.  
Outboard Marine
, 154 Ill. 2d at 108, 607 N.E.2d at 1212.

If an insurer takes the position that the complaint is not covered by the language contained in the policy, it must either defend the suit under a reservation of rights or seek a declaratory judgment that there is no coverage.  
Clemmons v. Travelers Insurance Co.
, 88 Ill. 2d 469, 475, 430 N.E.2d 1104, 1107 (1981).  If the insurer fails to take either of these steps, it will be estopped from asserting any policy defenses to coverage.  
Clemmons
, 88 Ill. 2d at 475, 430 N.E.2d at 1107.

Our review of the trial court's entry of summary judgment is 
de novo
.  
Outboard Marine
, 154 Ill. 2d at 102, 607 N.E.2d at 1209.
  The construction of an insurance policy is also a question of law, which is subject to 
de novo
 review.  
American States Insurance Co. v. Koloms
, 177 Ill. 2d 473, 479-80, 687 N.E.2d 72, 75 (1997).

In this case, we must first look to the allegations contained in the underlying complaint to determine whether they 
fall within or potentially fall within
 the language of the policy.  The underlying complaint is based on a theory of negligence against the insureds due to injuries sustained by the minor plaintiff while occupying property owned by the insureds.  These injuries were allegedly caused by exposure to lead-based paint, dust and residue.

Potomac maintains that it has no duty to defend and asserts that on July 28, 1993, a letter was sent to the insureds notifying them of a lead liability exclusion that would take effect in the October 12, 1993, policy.  Insureds' October 12, 1993, policy states in pertinent part:

"This insurance does not apply to:

'Bodily injury'
, 
'property damage'
, 
'personal injury'
, or 
'advertising injury' 
arising out of, resulting from, or in any way caused or contributed to by the actual, alleged or threatened ingestion, inhalation, absorption of, exposure to or presence of lead in any form emanating from any source ***."

Therefore, Potomac argues since the complaint alleges damages to minor plaintiff beginning on October 19, 1993, and the policy containing the lead hazard exclusion took effect on October 12, 1993, the underlying complaint does not fall within the policy language and is thereby excluded from coverage on its face.  As such, Potomac asserts, there is no duty to defend.

Plaintiff responds that proper notice of the lead exclusion was never tendered to them in violation of the notice statute contained in the Illinois Insurance Code (Code) (215 ILCS 5/143.17a, (a), (b), (c) (West 1992)).  Section 5/143a of the Code states in pertinent part:

"§ 143.17a.   Notice of intention not to renew.

a.  No company shall fail to renew any policy of insurance *** unless it shall send by mail to the named insured at least 60 days advance notice of its intention not to renew.  
The company shall maintain proof of mailing of such notice on one of the following forms:  a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial delivery service
. ***

b. *** [N]o mail company may increase the renewal premium on any policy of insurance *** by 30% or more, nor impose changes in deductibles or 
coverage that materially alter the policy
, unless the company shall have mailed or delivered to the named insured written notice of such increase or change in *** coverage at least 60 days prior to the renewal or anniversary date.  *** An exact and unaltered copy of such notice shall also be sent to the insured's broker ***.  The company shall maintain proof of mailing or proof of receipt whichever is required.

c.  Should a company fail to comply with the notice requirements of this Section, the policy shall terminate only as provided in this subsection.  In the event notice is provided at least 31 days, but less than 60 days prior to expiration of the policy, the policy shall be extended for a period of 60 days or until the effective date of any similar insurance procured by the insured, whichever is less, on the same terms and conditions as the policy sought to be terminated.  In the event notice is provided less than 31 days prior to the expiration of the policy, the policy shall be extended for a period of one year or until the effective date of any similar insurance procured by the insured, whichever if less, on the same terms and conditions as the policy sought to be terminated unless the insurer has manifested its willingness to renew at a premium which represents an increase not exceeding 30%."  (Emphasis added.)
 215 ILCS 5/143.17a, (a), (b), (c) (West 1992).

Plaintiff argues that since Potomac failed to maintain proof of mailing pursuant to the statute, the lead hazard exclusion never became a part of the policy.  Plaintiff and the insureds assert that the provision in section 143.17a (a) that "
The company shall maintain proof of mailing of such notice on one of the following forms:  a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial delivery service" (215 ILCS 5/143.17a (a) (West 1992)) also applies to section 143.17a (b).  As such, although these exact words are not repeated again in subsection (b), the legislature's intent for its application to section 143.17a in its entirety is clear.

Potomac maintains that subsection (a) and subsection (b) address two different subjects. Subsection (a) applies when an insurer intends 
not to renew
 the policy, whereas subsection (b) pertains to 
a change in premium, deductible or coverage
.  Furthermore, Potomac asserts, the legislative intent behind excluding the language contained in subsection (a) from subsection (b) was to ascribe a different meaning and that, therefore, it properly provided written notice of the lead exclusion and maintained proper proof of the mailing pursuant to subsection (b).

Effective January 1, 1990, the legislature amended section 143.17a by setting forth the specific means by which proof of mailing can be maintained – "
a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial delivery service.
"  (Emphasis added.)  215 ILCS 5/143.17a(a) (West 1992).

A statute must be construed so as to ascertain and give full effect to the intention of the legislature as expressed in the statute.  
The statute should be construed as a whole or in its entirety and the legislative intent gathered from the entire statute rather than from any one part thereof.  See 
People ex rel. Nelson v. Olympic Hotel Building Corp.
, 405 Ill. 440, 91 N.E.2d 597 (1950).

The Illinois Supreme Court case 
Ragan v. Columbia Mutual Insurance Co.
, 183 Ill. 2d 342, 701 N.E.2d 493 (1998), is instructive on this issue.  In 
Ragan
, the issue was whether the insurance company's failure to produce proof of mailing on a form as required by the cancellation provisions of the Code (215 ILCS 5/143.14(a) (West 1994)) invalidates the cancellation.  
Ragan
, 183 Ill. 2d at 344, 701 N.E.2d at 494.  Section 143.14(a) provides in pertinent part:

"
(a)  No notice of cancellation of any policy of insurance *** shall be effective unless mailed by the company to the named insured *** at the last mailing address known by the company.  
The company shall maintain proof of mailing of such notice on a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service
."  (Emphasis added.)  215 ILCS 5/143.14(a) (West 1994).

In 
Ragan
, the supreme court held that the language of section 143.14(a) is clear.  "There is no alternative method of proving compliance with the proof of mailing requirements other than to maintain the proof of mailing."  
Ragan
, 183 Ill. 2d at 351, 701 N.E.2d at 497.

Considering the legislative intent behind the statute, the supreme court has stated: "It is apparent from the wording of that provision in the context of the Insurance Code that the purpose of the statute is to protect the insured from cancellation of his insurance without his knowledge."  
Ragan
, 183 Ill. 2d at 351, 701 N.E.2d at 497.
  The court reasoned that by not requiring the insurer to maintain "proof of receipt" by the insured, the legislature clearly intended to strike a balance between the interest of the insured and the burden that would be placed on the insurer.  The supreme court concluded: "Under the statutory scheme [of merely requiring proof of mailing], the insurance company has a very low threshold of proof."  
Ragan
, 183 Ill. 2d at 351-52, 701 N.E.2d at 497.

The notice provision contained in section 143.14 is almost identical to the notice provision contained in the section 143.17a.  
We do recognize that "cancellation" and "nonrenewal" are separate terms under the Code.  However, our purpose for analogizing these two provisions is not to create a correlation between the purpose and effect behind the enactment of these provisions.  Instead, we believe that the legislative purpose behind amending section 143.14 to include the specific means by which "proof of mailing" can be established and the legislative purpose behind amending section 143.17a are similar, namely, to protect the insured from an insurer's failure to renew without the insured's knowledge.

The entire section 143.17a relates to an insurer's "Notice of intention not to renew."  Subsection (b) requires "proof of mailing or proof of receipt," without repeating the definition of what that is, which is in subsection (a).  However, "[u]nder basic rules of statutory construction, where the same words appear in different parts of the same statute, they should be given the same meaning unless something in the context indicates that the legislature intended otherwise."  
McMahan v. Industrial Comm'n
, 183 Ill. 2d 499, 513, 702 N.E.2d 545, 552 (1998), citing 
People v. Talbot
, 322 Ill. 416, 422, 153 N.E. 693 (1926).  There is no indication that the legislature intended to make proof of mailing in subsection (b) any different from proof of mailing required in subsection (a).  Contrary to Potomac's position, based upon the court's reasoning in 
Ragan
, one could surmise that the legislature intended an even higher threshold of proof in subsection (b) by including the words "proof of receipt."  See 
Ragan
, 183 Ill. 2d at 351-52, 701 N.E.2d at 497 (proof of mailing, as opposed to proof of receipt, is a very low threshold of proof).

In this case, Potomac provided as proof an unsigned copy of a letter
 it allegedly sent to its insured regarding the addition of the lead exclusion to the October 12, 1993, policy.  There was no "U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service" presented to the court by way of proof, which does not comply with the "proof of mailing" required under the statute.  As the supreme court so aptly summarized it in 
Ragan
, "There is no alternative method for proving compliance with the proof of mailing requirements other than to maintain the proof of mailing.  To allow other methods of proving compliance would circumvent the language and purpose of the statute."  
Ragan
, 183 Ill. 2d at 351, 701 N.E.2d at 497.

We find that insureds were not given proper notice of the lead hazard exclusion in the October 12, 1993, policy and, therefore, it never became a part of that policy.  As such, the facts alleged in the underlying complaint, 
i.e.
,  that the minor plaintiff suffered injuries due to the insureds' negligence,  
fell within
 the policy language.  As a result, Potomac's duty to defend
 its insureds was triggered.  Potomac, however, taking the position that the complaint was not covered under the policy, refused to defend its insureds under a reservation of rights and failed to file a declaratory judgment action.  Refusing to exercise either of these options, Potomac exercised a third option and risked being found in breach of its duty to defend.  Since we have determined that the lead hazard exclusion did not become a part of the policy, we also find that Potomac has breached its duty to defend and is estopped from raising any policy defenses to coverage.  See 
Clemmons
, 88 Ill. 2d at 475, 430 N.E.2d at 1107.

The next issue for our consideration is whether Potomac had a duty to indemnify.

Plaintiffs assert that there is a duty to indemnify because not only does the underlying complaint actually fall within coverage, but Potomac is "legally obligated to pay" due to the settlement reached between the insureds and the minor plaintiff.  They assert that it is of no consequence that the obligation to pay was created by a settlement agreement instead of an actual judgment in the trial court.  Finally, they assert that the release does not relieve the insureds or the insurer of their liability to plaintiff.

Potomac responds that in Illinois, the duty to indemnify does not arise until a judgment has been entered against the indemnitee or payments have been made.  It asserts that since the insureds have not paid any money to plaintiffs, they have no legal obligation to pay.
  Potomac further argues that, even if the insureds are legally obligated to pay, it does not have a duty to indemnify because it was not a party to the settlement and it did not sign it.  As a final argument, Potomac states that the release absolves the insureds of all liability and that since its liability is derivative of the insureds' liability, it has no legal obligation to pay.

As previously stated, if the facts alleged in the underlying complaint 
fall within or potentially fall within
 the coverage of the policy, the insurer's duty to defend is triggered.  
Outboard Marine
, 154 Ill. 2d at 108, 607 N.E.2d at 1212.
  However, the duty to indemnify arises 
only if
 the facts alleged 
actually fall within coverage
.  
Outboard Marine
, 154 Ill. 2d at 127-28, 607 N.E.2d at 1221.
  "[T]he question of whether the insurer has a duty to indemnify the insured for a particular liability is only ripe for consideration if the insured has already incurred liability in the underlying claim against it."  
Outboard Marine
, 154 Ill. 2d at 127, 607 N.E.2d at 1221
.  In other words, the duty to indemnify arises when the insured becomes "legally obligated" to pay damages in the 
underlying action that gives rise to a claim under the policy.  One does not become legally obligated until a judgment or 
settlement
 is reached between the parties.  
Douglas v. Allied American Insurance
, 312 Ill. App. 3d 535, 541, 727 N.E.2d 376, 381 (2000).

The law in Illinois is clear that there are serious consequences that result due to an insurer's unjustified refusal to defend a covered claim, including waiver of its right to approve a settlement.  
An insured has the right to enter into a reasonable settlement on its own after the insurer has breached its duty to defend.  
Thornton v. Paul
, 74 Ill. 2d 132, 144, 384 N.E.2d 335, 340 (1978).
  The measure of damages for such a breach is generally the amount of the judgment against the insured or of a reasonable settlement, plus any expenses incurred.
  See 
Kinnan v. Charles B. Hurst Co.
, 317 Ill. 251, 256-60, 148 N.E. 12 (1925) (
an insured entered into a settlement and recovered the cost thereof from an insurer who had failed to defend).  See also 
Aetna Casualty & Surety Co. v. Coronet Insurance Co.
, 44 Ill. App. 3d 744, 358 N.E.2d 914 (1976)
 (by its unjustified refusal to defend an action against the insured, an automobile liability insurer becomes subject to liability for the amount of the judgment rendered against the insured or of the settlement made by him, liability for the expenses incurred by the insured in defending the suit, and liability for any additional damage traceable to its refusal to defend). 

There is a definitive distinction in Illinois between cases in which a settlement was reached after an insurer has breached its duty to defend and cases in which there was no breach.  In cases where there was no breach, the court has held that the insurer must be a party to the settlement agreement.  See 
Alliance Syndicate, Inc. v. Parsec, Inc.
, 318 Ill. App. 3d 590, 600, 741 N.E.2d 1039, 1046 (2000).  In cases such as this one, however, where there has been a breach of the duty to defend, the insured may enter into a settlement without the insurer's approval.  
Thornton
, 74 Ill. 2d 132, 384 N.E.2d 335; 
Kinnan
, 317 Ill. 2d 251, 148 N.E.2d 12.  Therefore, the fact that Potomac did not approve or sign the settlement agreement is of no 
consequence.

However, in cases where a settlement is reached after an insurer has breached its duty to defend, the courts have raised some concern that the settlement might have been entered into in order to obtain insurance coverage for an otherwise uninsurable claim.  
United States Gypsum Co. v. Admiral Insurance Co.
, 268 Ill. App. 3d 598, 637, 643 N.E.2d 1226, 1243 (1994).  Therefore, it follows that an insurer that has breached its duty to defend may 
only
 attack a settlement agreement by demonstrating that a settlement agreement is 
unreasonable
 (
i.e
., the settlement was made in anticipation of liability and the settlement amount is unreasonable), or that the settlement agreement contains otherwise 
uninsurable items
.  
Gypsum
, 
268 Ill. App. 3d at 637, 643 N.E.2d at 1243.  

Recently, in 
Platinum Technology, Inc. v. Federal Insurance Co.
, No. 99 C 7378 (February 2, 2001), the United States District Court for the Northern District of Illinois held that, as a matter of law, the Illinois estoppel rule for insurers that breach their duty to defend does not estop an insurer from claiming that a settlement agreement contains uninsurable elements and is, therefore, not the responsibility of the insurer. 

In 
Platinum
, Platinum Software Company (PSC) filed a complaint against Platinum Technology, Inc. (PTI), the insured, alleging trademark infringement. 
 PTI tendered both complaints to Federal Insurance Company (Federal), the insurer, and requested defense and indemnification, but
 Federal refused to either defend or indemnify PTI.  
Platinum
, No. 99 C 7378
, slip op. at 1-2.  Six months later, PTI and PSC settled the lawsuit.  As part of the settlement agreement, PTI was required to pay PSC $4 million and provide a $6 million credit toward the purchase of products and services from PTI.  The settlement agreement contained mutual general releases from future liability, provisions for dismissing the underlying complaint with prejudice, and provisions requiring PSC to transfer to PTI the trademark rights in "Platinum."  
Platinum
, No. 99 C 7378
, slip op. at 2.

PTI subsequently filed an action against Federal seeking a declaration that Federal had breached its duty to defend, which was granted.  The court further held that Federal was estopped from relying on "policy defenses" to avoid coverage in the lawsuit between PTI and PSC.  Both parties subsequently filed motions for partial summary judgment.  
Platinum
, No. 99 C 7378
, slip op. at 1.

PTI argued that since Federal breached its duty to defend and indemnify, Federal should indemnify PTI for all its reasonable settlement amounts and render judgment in its favor as a matter of law.  
Platinum
, No. 99 C 7378
, slip op. at 2.

Federal argued that the settlement agreement was not reasonable and that PTI suffered no loss and incurred no legal liability to PSC.  Federal asserted that the settlement agreement was actually a purchase of a trademark and not a payment for damages resulting from PTI's trademark infringement, and that the $6 million product and services discount offered by PTI to PSC amounted to speculation and conjecture, which is an uninsurable claim.  
Platinum
, No. 99 C 7378
, slip op. at 3.

The court reasoned that although it did hold that Federal was completely estopped from denying coverage based upon "policy defenses," it did not hold that Federal was estopped from denying coverage on 
other grounds
, outside of policy defenses.  
Platinum
, No. 99 C 7378
, slip op. at 3.
  "Simply because Federal breached its duty to defend, it does not give PTI a blank check in which to settle the case.  PTI only has a right to claim indemnification of costs stemming from a 
reasonable settlement of the underlying suit
."  
Platinum
, No. 99 C 7378
, slip op. at 3.

Following this district's reasoning in 
Gypsum
, the 
Platinum
 court concluded that since there is a concern in cases such as this that the settlement was entered into in order to obtain insurance coverage for an otherwise uninsurable claim (
Gypsum
, 268 Ill. App. 3d at 637, 643 N.E.2d at 1243), it follows that an insurer that has breached its duty to defend may attack a settlement agreement by demonstrating that a settlement agreement is 
unreasonable
 or that the settlement agreement contains otherwise 
uninsurable items
.  
Platinum
, No. 99 C 7378
, slip op. at 4.

The facts in 
Platinum
 are remarkably analogous to the facts in the case at bar.  Just as the insurer in 
Platinum
, the insurer in this case breached its duty to defend, and the insureds subsequently entered into a settlement agreement without the insurer's approval.  Applying the reasoning in 
Platinum
 to this case, although Potomac has waived its right to approve the settlement agreement, it is allowed to attack the settlement if it contained 
uninsurable items
 or if it was 
unreasonable
.

It has already been established that the settlement was based on an insurable loss since the lead hazard exclusion never became a part of the policy.  Potomac asserts, however, that this is still an uninsurable loss because there is no "legal obligation to pay" created by this settlement agreement in this case.

First, Illinois courts are in agreement that the legal obligation to pay arises if an actual judgment has been rendered in the trial court 
or if a settlement has been reached between the parties
.  
Douglas
, 312 Ill. App. 3d at 541, 727 N.E.2d at 381.  The trial court's determination that no judgment was entered against the insureds for which Potomac is obligated to indemnify the insureds ignores the fact that 
a settlement also creates a legal obligation to pay
.  See also 
National Union Fire Insurance Co. v. Continental Illinois Corp.
, 673 F. Supp. 267 (N.D. Ill. 1987) (an actual judgment is not necessary because insurers are adequately protected against unreasonable and exorbitant settlements by the requirement that the insured establish the reasonableness for the settlement if it is challenged).
  "When an insured pays an insurance premium, part of the bargained-for protection is the insurer's payment of settlements (not just its payments of judgments at trial)."  
National Union
, 673 F. Supp. at 273.

Second, in granting summary judgment in favor of Potomac on the issue of indemnity, the trial court stated that the "insureds have no right to assert a cause of action against Potomac for indemnity" due to the fact that "the insureds have not paid any sums or incurred any liability for 
damages."  As the court explains in 
Platinum
, actually paying a sum certain towards the settlement is not a precursor to incurring liability.  
Platinum
, No. 99 C 7378
, slip op. at 10.
  The insured can become liable to the plaintiff 
after
 a settlement is reached but 
before
 any money is tendered.

This issue is squarely addressed in 
Platinum
, where Federal argued that because PTI had not paid any amount toward the $6 million credit and because PTI continued to negotiate that part of the settlement agreement with PSC, it was not liable to indemnify PTI for that amount. 
Platinum
, No. 99 C 7378
, slip op. at 10.
  The court reasoned that it is well "established that an indemnity insurer must pay the value of settle claims at judgment or settlement 
even though the insured has not yet paid those claims
.  Accordingly, the only argument available to Federal is whether the $6 million credit is a reasonable valuation of PSC's claim of trademark infringement." 
Platinum
, No. 99 C 7378
, slip op. at 10.

Applying the court's logic in 
Platinum
 to this case, the mere fact that a judgment at trial was not entered against the insureds or that the insureds have not paid any money does not mean that Potomac is not liable for the amount of the settlement if it is reasonable.

Third, both the trial court and Potomac rely on 
Gatto v. Walgreen Drug Co.
, 61 Ill. 2d 513, 337 N.E.2d 23 (1975), and 
American Mutual Liability Insurance Co. v. Hoge
, 87 Ill. App. 3d 243, 409 N.E.2d 24 (1980).  However, neither case addresses the pertinent issue in this case, 
i.e.
, whether Potomac has a duty to indemnify the plaintiffs where the insureds and the plaintiffs have entered into a settlement agreement after Potomac refused to defend the insureds on an insurable claim.  An insurer's duty
 to defend and/or indemnify is not addressed in either case, and 
Gatto
 does not involve an insurer/insured relationship.  It is true that both cases deal with the law on assignment.  However, the factual scenario presented in this case requires us to consider the subissue of assignment in the context of the broader issue of an insurer's duty to defend and indemnify, instead of merely considering the issue of assignment in a vacuum.  See 
Illinois Tool Works v. Home Indemnity Co.
, 24 F. Supp. 2d 851 (N.D. Ill. 1998) (the court held where an insurer breached its duty to defend, the insurer could only attack the settlement's validity by showing that it was unreasonable or based upon an uninsurable item, where
 plaintiff and insured entered into a settlement agreement in which insured assigned all of its rights under the policy to the plaintiff).

Finally, the release does not negate Potomac's legal obligation to pay.  The settlement provides that plaintiff release the insureds and that the insureds release plaintiff from all claims in the future and prior to the date of the agreement related to this cause of action.  It also provides:  "This release, however, does not include claims arising out of a failure of a party to perform in conformity with the terms of this agreement."  As such, the release did not include the insureds' failure to perform their obligation under the terms of the settlement.  Since Potomac's obligation to pay is derivative of the insureds', the release also excludes Potomac's failure to perform under the terms of the settlement unless the settlement amount is unreasonable.

The release contained in this settlement agreement is not uncommon.  In 
Platinum
, a mutual release was entered into as part of the settlement agreement.  
Platinum
, No. 99 C 7378
, slip op. at 2.
  However, this was of no consequence to the court.  Due to Federal's breach of its duty to defend, it could only attack the reasonableness of the settlement or refuse to pay if it was an otherwise uninsurable claim.

Almost an identical argument was asserted by the insurer in 
Illinois Tool Works
.  In that case the plaintiff and the insured entered into a settlement agreement and mutual releases.  
Illinois Tool Works
,
 24 F. Supp. 2d at 853.
  Once again following the logic in 
Gypsum
, the court held that the insurer could only attack the settlement's validity by showing that it was unreasonable or that it was based upon an uninsurable item.  
Illinois Tool Works
,
 24 F. Supp. 2d at 
854.

Based upon the case law, we find that Potomac has a legal obligation to indemnify.

With regard to the reasonableness of the settlement agreement, the insureds must show that the agreement was made in anticipation of litigation and that the settlement amount was reasonable.  As the court recognized in 
Platinum
, "the general rule is that if an insured settles an underlying claim prior to a verdict, then the insured must show that the settlement was for an otherwise covered loss in 'reasonable anticipation of liability.' "  
Platinum
, No. 99 C 7378
, slip op. at 4.
  Establishing actual liability is not necessary.  The "insured need only show potential liability on the facts known to the insured at the time of settlement, and show that the final amount agreed upon is reasonable in view of possible damages and in view of the probability of the claimant's success against the insured."  
Platinum
, No. 99 C 7378
, slip op. at 4.

The record indicates that the insureds could have reasonably anticipated liability in this case.  The underlying complaint alleged that the insureds were aware that the property contained lead-based paint.  Additionally, the complaint also asserted that on several occasions the City of Chicago's department of health visited the property and notified insureds that their property contained hazardous lead-based paint during the period of time within which the minor plaintiff was allegedly
 injured due to exposure.  The city also notified the insureds of prior noncompliance with abatement orders.  Furthermore, the complaint alleged that the minor plaintiff's blood level contained lead exceeding the maximum considered as safe.  
Finally, the insureds acknowledged that they anticipated liability and wanted to settle with plaintiff  because they thought that the actual damages award at trial might exceed the settlement amount.  As such, we find that the insureds settled in reasonable anticipation of liability.
  See 
Sears v. Manco Products
, No. 85 C 6641  (April 4, 1986).

Turning to the "reasonableness" of the settlement amount, this is a matter bearing solely upon the issue of damages.  
St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.
, 12 Ill. App. 3d 165, 169, 298 N.E.2d 289, 292, (1973).  Courts normally look to the policy limit to determine whether the settlement amount falls below the policy limits.  If it does, the settlement amount is upheld as reasonable.  In this case, plaintiffs and the insureds settled for $600,000.  However, the policy limit for general liability and medical payments is $300,000 for each occurrence.  
In 
Conway v. Country Casualty Insurance Co.
, 92 Ill. 2d 388, 442 N.E.2d 245 (1982), the Illinois Supreme Court explained that " '[w]hile the wrongful refusal of the insurer to conduct the defense of an action based upon a claim within the coverage of the policy makes it liable, the insurer is not exposed to a greater liability to the insured than the limit of the amount stated in the policy.' "  92 Ill. 2d 388, 442 N.E.2d 245
.  The only exception to this rule is if an insurer breaches its duty to defend in bad faith.  See 
Reis v. Aetna Casualty & Surety Co.
, 69 Ill. App. 3d 777, 790, 387 N.E.2d 700, 710 (1978) (an insurer is not liable for damages in excess of the policy limits in the absence of bad faith).

 In this case, the parties have not had an opportunity to address the issue of whether the settlement amount is reasonable.  Since Illinois case law is clear that in cases such as this one, where the settlement amount exceeds the policy limits, there must be a clear showing that the insurer acted in bad faith, we are unable to rule on this issue at this time.  Therefore, we remand the case solely for the purpose of determining the reasonableness of the settlement amount.

Based upon on the foregoing, we affirm the trial court's ruling of summary judgment in favor of the plaintiffs on the issue of Potomac's duty to defend and reverse the ruling in favor of Potomac on the issue of its duty to indemnify, and remand for further proceedings.

Affirmed in part and reversed in part; cause remanded.

HARTMAN, P.J., and BARTH, J. concur.